UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF JAROMIR PROKOP | NO. MJ20-154<br><br>MEMORANDUM OF EXTRADITION LAW AND REQUEST FOR DETENTION PENDING EXTRADITION PROCEEDINGS |

The United States, in fulfilling its treaty obligations to the Czech Republic respectfully requests that the fugitive in this case, Jaromir Prokop ("Prokop"), be held without bond pending the hearing on the certification of his extraditability pursuant to 18 U.S.C. §§ 3181, *et seq*. This memorandum summarizes the framework of extradition law in the United States and sets forth the reasons why Prokop should be detained. In short, Prokop should be detained because he cannot overcome the strong presumption against bail in international extradition cases. Specifically, he cannot meet his burden of showing that he does not pose a risk of flight, is not a danger to the community, and that special circumstances exist warranting his release.

**I.    BACKGROUND**

The Czech Republic seeks the provisional arrest, with a view towards extradition, of Prokop so that he may serve a sentence of thirteen years and six months for convictions as an accomplice to the following four offenses: two counts of robbery in

violation of Section 9, Subsection 2, and Section 234, Subsections 1, 2(a)-(b) of the Penal Code of the Czech Republic; one count of robbery in violation of Section 9, Subsection 2, and Section 234, Subsection 1, 2(a) of the Penal Code of the Czech Republic; and one count of attempted robbery in violation of Section 8, Subsection 1, Section 9, Subsection 2, and Section 234, Subsections 1, 3 of the Penal Code of the Czech Republic. A judge in the Regional Court of Prague, Czech Republic, issued a warrant for Prokop's arrest on January 13, 2020. Prokop's convictions were based on the following facts summarized below. *See* Dkt. 1 (Complaint) for a more detailed summary.

**A.  Count 1 – Robbery Against Vaclav Toman**

On November 6, 1996, Prokop and other accomplices attacked, kidnapped, robbed and killed Vaclav Toman (Toman), who Prokop believed owed him money. Executing a pre-conceived plan, Prokop's accomplices accosted Toman in his residential garage in Prague, forced him between the seats of his car, and tied his hands. One of the accomplices took Toman's suitcase, which contained an undetermined amount of cash, bankcards, and other items, and left the scene to meet Prokop at a separate location. Meanwhile, the other accomplices began driving with the victim to Prokop's cottage outside of the city. The accomplices drugged Toman with a substance supplied by Prokop, causing Toman to lose consciousness. Toman's body was recovered in a wooded area near Prague four days later. According to medical reports, Toman was physically beaten and ultimately died from asphyxiation and severe injuries to his chest and neck.

**B.  Count 2 – Robbery Against OBI Store**

On November 26, 1995, Prokop and his accomplices committed a robbery of an OBI department store in Prague. Prokop's accomplices entered the store carrying firearms and proceeded to assault, tie up, and drug two security guards. The perpetrators then held the cashier at gunpoint and forced her to give them the keys to the safe and lay down on the ground. She complied, and the perpetrators drugged her. The drugs injected into the victims to subdue them was provided by Prokop. The perpetrators stole

approximately CZK 2,719,000 (approximately $107,000 in 2020 exchange rates) from the safe, left the store, and gave the money to Prokop and another accomplice, who were waiting nearby. All of the accomplices split the money amongst themselves.

C.     **Count 3 – Attempted Robbery Against Pavel Kokrment**

On March 3, 1996, Prokop and his accomplices attacked, kidnapped, and robbed Pavel Kokrament (Kokrament), one of Prokop's business partners. In accordance with a pre-conceived plan, Prokop's accomplices attacked Kokrament on a street in Prague, assaulted him with a bat, tied him up, put a balaclava over his head and put him in one of the accomplice's cars. The accomplices drove the car and victim to a location outside the city, where they met Prokop and another accomplice. Prokop and the other accomplices demanded a payment of CZK 10,000,000 (approximately $394,000 in 2020 exchange rates) from Kokrament in exchange for his release. The victim gave them the key and code to his safe deposit box as well as the key to his apartment. The assailants removed CZK 350,000 from the safe deposit box. Under threat of violence and restraint, Kokrament paid Prokop and his accomplices CZK 2,000,000 (approximately $79,000) through an acquaintance, which led to his release. Prokop and his accomplices split the money amongst themselves.

D.     **Count 4 – Robbery Against Miroslav Marik**

On August 29, 1996, Prokop and his accomplices robbed a truck driver of CZK 808,000 (approximately $32,000 in 2020 exchange rates). Armed with firearms, Prokop's accomplices stopped a truck, forcibly removed the driver from the vehicle, tied him up, and stole a bag containing approximately CZK 808,000 in cash. The perpetrators met up with Prokop and another accomplice, who were waiting nearby to assist the perpetrators in leaving the scene. All of the accomplices split the money amongst themselves. Prokop provided one of the firearms used in the robbery.

//

//

Following a trial against Prokop and his co-defendants,[1] the Regional Court in Prague convicted Prokop on October 19, 2006, as an accomplice to three counts of robbery and one count of attempted robbery. The Regional Court issued a decision consisting of 185 pages, which set forth the facts of the case, including summaries of witness testimony and documentary evidence, and provided analysis on why the evidence was sufficient to support a finding that Prokop committed the offenses with which he was charged. The Regional Court sentenced Prokop to fourteen years' imprisonment for his offenses. Through his counsel, Prokop appealed the conviction to the High Court in Prague, which issued a 29-page decision on June 14, 2007, upholding Prokop's conviction but reducing his sentence to thirteen years and six months.[2] Prokop's conviction became final on June 14, 2007.[3]

Relying on the warrant issued in January 2020, the Czech Republic has requested Prokop's provisional arrest, with a view towards extradition, pursuant to its extradition treaty with the United States ("the Treaty").[4] On April 3, 2020, the United States, in accordance with its obligations under the Treaty and pursuant to 18 U.S.C. §§ 3181 *et seq.*, filed a complaint in this District seeking a warrant for Prokop's arrest. This Court issued the arrest warrant, and Prokop was arrested on April 28, 2020. Prokop is currently in the custody of the U.S. Marshals Service.

//

---

[1] Prokop was not physically present for his trial in the Czech Republic.

[2] The High Court concluded that, for Count 1, Prokop should not be held liable for Toman's death and reduced his sentence accordingly.

[3] The Czech Republic initially sought Prokop's extradition from the United States in 2011, but the case was closed in 2016 after U.S. law enforcement authorities were unable to locate him.

[4] Treaty Between the United States and Czechoslovakia for the Extradition of Fugitives from Justice, U.S.-Czech., July 2, 1925, 44 Stat. 2367, *as amended by* Supplementary Extradition Treaty Between the United States of America and Czechoslovakia, U.S.-Czech., Apr. 29, 1935, 49 Stat. 3253, *and as further amended by* Second Supplementary Treaty on Extradition Between the United States of America and the Czech Republic, U.S.-Czech., May 16, 2006, S. TREATY DOC. NO. 109-14 (2006).

## II. LEGAL FRAMEWORK OF EXTRADITION PROCEEDINGS

### A. The Limited Role of the Court in Extradition Proceedings

The extradition process is *sui generis*. Extradition is primarily an executive function with a specially defined role for the Court, which is authorized by statute to hold a hearing at which it determines whether to certify to the Secretary of State that the evidence provided by the requesting country is "sufficient to sustain the charge." 18 U.S.C. § 3184; *see*, *e.g.*, *United States v. Knotek*, 925 F.3d 1118, 1124 (9th Cir. 2019) ("As we have stated on many occasions, '[e]xtradition is a matter of foreign policy,' a diplomatic process over which the judiciary provides 'limited' review.") (citation omitted). The Secretary of State, and not the Court, then decides whether the fugitive should be surrendered to the requesting country. 18 U.S.C. §§ 3184, 3186; *Santos v. Thomas*, 830 F.3d 987, 993 (9th Cir. 2016) (internal citations omitted). "This bifurcated procedure reflects the fact that extradition proceedings contain legal issues peculiarly suited for judicial resolution, such as questions of the standard of proof, competence of evidence, and treaty construction, yet simultaneously implicate questions of foreign policy, which are better answered by the executive branch." *United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997).

At the extradition hearing, the Court's role is limited to considering the requesting country's evidence and determining whether the legal requirements for certification of extraditability—as defined in the applicable extradition treaty, statutes, and case law—have been established. *See Quinn v. Robinson*, 783 F.2d 776, 786 n.3 (9th Cir. 1986) (citing *Charlton v. Kelly*, 229 U.S. 447, 461 (1913)) (analogizing extradition hearings to preliminary hearings in a criminal case). If the Court finds that the requirements for certification have been met, it must provide the certification to the Secretary of State, together with a copy of any testimony taken before the Court, and must commit the fugitive to the custody of the U.S. Marshal to await the Secretary's final determination regarding surrender. 18 U.S.C. § 3184 (following certification, the extradition judge "shall issue his warrant for the commitment of the person so charged to the proper jail,

MEMORANDUM OF EXTRADITION LAW
AND REQUEST FOR DETENTION PENDING
EXTRADITION PROCEEDINGS / PROKOP - 5

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

there to remain until such surrender shall be made."); *see also Vo v. Benov*, 447 F.3d 1235, 1237 (9th Cir. 2006); *Barapind v. Reno*, 225 F.3d 1100, 1105 (9th Cir. 2000).

### B. The Requirements For Certification

The Court should certify to the Secretary of State that a fugitive is extraditable when the following requirements have been met: (1) the judicial officer is authorized to conduct the extradition proceeding; (2) the Court has jurisdiction over the fugitive; (3) the applicable extradition treaty is in full force and effect; (4) the crimes for which surrender is requested are covered by the treaty; and (5) there is sufficient evidence to support a finding of probable cause as to each charge. *See*, *e.g.*, *Manta v. Chertoff*, 518 F.3d 1134, 1140 (9th Cir. 2008) (internal citations omitted). The following sections briefly discuss each of those requirements.

#### 1. Authority over the proceedings

The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State." 18 U.S.C. § 3184. As such, the judicial officer conducting the extradition hearing prescribed by § 3184 does not exercise "any part of the judicial power of the United States," *In re Extradition of Kirby*, 106 F.3d 855, 866 (9th Cir. 1996), but rather is acting in a "non-institutional capacity by virtue of a special authority," *In re Extradition of Howard*, 996 F.2d 1320, 1325 (1st Cir. 1993). Both magistrate judges and district judges may render a certification under § 3184. *See Austin v. Healey*, 5 F.3d 598, 601-02 (2d Cir. 1993); W.D. Wash. MJR 1(c) (authorizing magistrate judges to conduct extradition proceedings in accordance with 18 U.S.C. § 3184).

#### 2. Jurisdiction over the fugitive

The Court has jurisdiction over a fugitive, such as Prokop, who is found within its jurisdictional boundaries. 18 U.S.C. § 3184 ("[A judge] may, upon complaint made under oath, charging any person found within his jurisdiction . . . issue his warrant for the apprehension of the person so charged.").

### 3. Treaty in full force and effect

Section 3184 provides for extradition in specifically defined situations, including whenever a treaty or convention for extradition is in force between the United States and the requesting state. *See id.*; *see also Then v. Melendez*, 92 F.3d 851, 853 (9th Cir. 1996) (noting that "the executive branch does not have the power to extradite alleged criminals absent a valid extradition treaty."). The government will satisfy this requirement at the extradition hearing by offering into evidence a declaration from an attorney in the Office of the Legal Adviser for the U.S. Department of State, attesting that there is a treaty in full force and effect between the United States and the Czech Republic. The Court must defer to the Department of State's determination in that regard. *See Then*, 92 F.3d at 854.

### 4. Crimes covered by the treaty

Extradition treaties create an obligation for the United States to surrender fugitives under the circumstances defined in the Treaty. Article I of the applicable treaty in this case requires the return of fugitives who "may be charged with, or may have been convicted of any of the crimes or offenses specified in Article II of the present Treaty." Article II of the Treaty provides:

> A crime or offense shall be an extraditable crime or offense if it is punishable under the laws of the Requesting and Requested States by deprivation of liberty for a maximum period of more than one year or by a more severe penalty. A crime or offense shall also be an extraditable crime or offense if it consists of an attempt or conspiracy to commit, or participation in the commission of, an extraditable crime or offense.

This requirement is known as "dual criminality." *See Knotek*, 925 F.3d at 1118.

In assessing whether the crimes for which extradition is requested are covered by the Treaty, the Court should examine the description of criminal conduct provided by the Czech Republic in support of its conviction and decide whether that conduct would be criminal under U.S. federal law, the law of the state in which the hearing is held, or the law of a preponderance of the states. *See, e.g., id.* at 1129 n.10. A requesting country need not establish that its crimes are identical to ours. *Id.* at 1131; *Clarey v. Gregg*, 138

MEMORANDUM OF EXTRADITION LAW
AND REQUEST FOR DETENTION PENDING
EXTRADITION PROCEEDINGS / PROKOP - 7

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

F.3d 764, 765 (9th Cir. 1998) ("The primary focus of dual criminality has always been on the conduct charged; the elements of the analogous offenses need not be identical."). Rather, "the court looks at whether 'the essential character of the transaction is the same, and made criminal by both statutes.'" *Knotek*, 925 F.3d at 1131 (quoting *Wright v. Henkel*, 190 U.S. 40, 62 (1903) (brackets omitted)). Indeed, "[t]he law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries. It is enough if the particular act charged is criminal in both jurisdictions." *Collins v. Loisel*, 259 U.S. 309, 312 (1922).

In fulfilling its function under Section 3184, the Court should liberally construe the Treaty in order to effectuate its purpose, namely the surrender of fugitives to the requesting country. *Factor v. Laubenheimer*, 290 U.S. 276, 298-300 (1933); *see also, e.g., Martinez v. United States*, 828 F.3d 451, 463 (6th Cir. 2016) (en banc) ("default rule" is that any ambiguity in extradition treaty must be construed in favor of "facilitat[ing] extradition"); *In Re Extradition of Mathison*, 974 F. Supp. 2d 1296, 1305 (D. Or. 2013). Accordingly, because extradition treaties should be "interpreted with a view to fulfil our just obligations to other powers," *Grin v. Shine*, 187 U.S. 181, 184 (1902), the Court should "approach challenges to extradition with a view towards finding the offenses within the treaty," *McElvy v. Civiletti*, 523 F. Supp. 42, 48 (S.D. Fla. 1981).

**5. Probable cause that the fugitive has committed the offenses**

To certify the evidence to the Secretary of State, the Court must conclude there is probable cause to believe that the crimes charged by the Czech Republic were committed by the person before the Court. *See Vo*, 447 F.3d at 1237. The evidence is sufficient, and probable cause is established, if it would cause a "prudent man" to "believ[e] that the (suspect) had committed or was committing an offense." *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) (internal quotation marks and citation omitted). The extradition judge's probable cause determination is "not a finding of fact 'in the sense that the court has weighed the evidence and resolved disputed factual issues,'" but instead "'serve[s] only

MEMORANDUM OF EXTRADITION LAW
ANDREQUEST FOR DETENTION PENDING
EXTRADITION PROCEEDINGS / PROKOP - 8

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

the narrow function of indicating those items of submitted evidence on which the decision to certify extradition is based.'" *Quinn*, 783 F.2d at 791 (quoting *Caplan v. Vokes*, 649 F.2d 1336, 1342 n.10 (9th Cir. 1981)).

In a post-conviction case, such as this one, the Court's determination that there is probable cause may be based upon a judgment of conviction in the requesting country. *See*, *e.g.*, *Arias Leiva v. Warden*, 928 F.3d 1281, 1295 (11th Cir. 2019); *Spatola v. United States*, 925 F.2d 615, 618 (2d Cir. 1991). This is also true in cases involving *in absentia* convictions. *See United States v. Bogue*, 1998 WL 966070, at *2 (E.D. Pa. Oct. 13, 1998) ("a conviction, although obtained *in absentia*, provides sufficient evidence of criminality to satisfy the probable cause requirements of 18 U.S.C. § 3184."); *United States v. Avdic*, 2007 WL 1875778, at *8 (D.S.D. June 28, 2007) (same); *Esposito v. I.N.S.*, 936 F.2d 911, 914 (7th Cir. 1991) ("at the very least, *in absentia* convictions properly constitute probable cause to believe that the petitioner is guilty of the crimes in question."); *see also Haxhiaj v. Hackman*, 528 F.3d 282 (4th Cir. 2008) (upholding probable cause finding based on a foreign court decision, issued *in absentia*, that provided "a summary of the facts and relevant evidence").

**C.      An Extradition Hearing Follows Unique Procedures**

As detailed above, the purpose of an extradition hearing is to decide the sufficiency of each charge for which extradition is requested under the applicable extradition treaty; it is not to determine the guilt or innocence of the fugitive—that determination is reserved for the foreign court. *Collins*, 259 U.S. at 316; *Neely v. Henkel*, 180 U.S. 109, 123 (1901). Accordingly, an extradition hearing is not a criminal proceeding, *see*, *e.g.*, *Kamrin v. United States*, 725 F.2d 1225, 1228 (9th Cir. 1984); *Martin v. Warden, Atlanta Penitentiary*, 993 F.2d 824, 828 (11th Cir. 1993), and it is governed by "the general extradition law of the United States and the provisions of the Treaty," *Emami v. U.S. Dist. Ct.*, 834 F.2d 1444, 1450-51 (9th Cir. 1987).

The Federal Rules of Evidence do not apply to extradition proceedings. Fed. R. Evid. 1101(d)(3) ("These rules—except for those on privilege—do not apply to . . .

miscellaneous proceedings such as extradition or rendition."); *Then*, 92 F.3d at 855. Indeed, hearsay evidence is admissible at an extradition hearing and, moreover, a certification of extraditability is properly based entirely on the authenticated documentary evidence and information provided by the requesting government. *See*, *e.g.*, *Collins*, 259 U.S. at 317; *Emami*, 834 F.2d at 1451 (citing *Quinn*, 783 F.2d at 815; *Zanazanian*, *v. United States*, 729 F.2d 624, 626 (9th Cir. 1984)); *Artukovic v. Rison*, 784 F.2d 1354, 1356 (9th Cir. 1986). Nothing more is required, and typically nothing more is provided. *See*, *e.g.*, *Zanazanian*, 729 F.2d at 627-28 (police report describing witness statements is competent evidence); *In re Extradition of Mainero*, 990 F. Supp. 1208, 1212-13 & 1226-29 (S.D. Cal. 1997) (statements of co-conspirators and other witnesses sufficient in extradition to Mexico). Extradition treaties do not require, or even anticipate, the testimony of live witnesses at the hearing. Indeed, requiring the "demanding government to send its citizens to another country to institute legal proceedings, would defeat the whole object of the treaty." *Bingham v. Bradley*, 241 U.S. 511, 517 (1916); *see also*, *e.g.*, *Zanazanian*, 729 F.2d at 626-27.

The Federal Rules of Criminal Procedure also do not apply to extradition proceedings. Fed. R. Crim. P. 1(a)(5)(A) ("Proceedings not governed by these rules include . . . the extradition and rendition of a fugitive"); *Mathison*, 974 F. Supp. 2d at 1304. A fugitive has no right to discovery. *See*, *e.g.*, *Prasoprat v. Benov*, 421 F.3d 1009, 1014 (9th Cir. 2005). Furthermore, many constitutional protections applicable in criminal cases do not apply. For example, a fugitive has no right to cross-examine witnesses who might testify at the hearing, *see*, *e.g.*, *Oen Yin-Choy v. Robinson*, 858 F.2d 1400, 1406-07 (9th Cir. 1988); there is no Sixth Amendment right to a speedy trial, *see*, *e.g.*, *In re Extradition of Kraiselburd*, 786 F.2d 1395, 1398 (9th Cir. 1986); the Fifth Amendment guarantee against double jeopardy does not apply to successive extradition proceedings, *see*, *e.g.*, *In re Extradition of Powell*, 4 F. Supp. 2d 945, 951 (S.D. Cal. 1998) (citing *Collins*, 262 U.S. at 429); the exclusionary rule is not applicable, *see*, *e.g.*,

*Simmons v. Braun*, 627 F.2d 635, 636-37 (2d Cir. 1980); and a fugitive does not have the right to confront his accusers, *see*, *e.g.*, *Bingham*, 241 U.S. at 517.

Relatedly, a fugitive's right to present evidence is severely constrained. A fugitive may not introduce evidence that contradicts the evidence submitted on behalf of the requesting country, but rather may only introduce evidence explaining the submitted evidence. *See Charlton*, 229 U.S. at 461-62; *Strunk*, 293 F. Supp. 2d at 1122. A contrary rule "might compel the demanding government to produce all its evidence . . . both direct and rebutting, in order to meet the defense thus gathered from every quarter." *Collins*, 259 U.S. at 316 (quoting *In re Extradition of Wadge*, 15 F. 864, 866 (S.D.N.Y. 1883)). The admission of explanatory evidence is largely within the discretion of the Court. *See Hooker v. Klein*, 573 F.2d 1360, 1369 (9th Cir. 1978); *Strunk*, 293 F. Supp. 2d at 1122.

In addition, courts routinely reject technical and affirmative defenses in extradition proceedings. *See*, *e.g.*, *Bingham*, 241 U.S. at 517 (rejecting objections to extradition that "savor of technicality"); *Hooker*, 573 F.2d at 1368 (noting that extradition court "properly may exclude evidence of alibi, or facts contradicting the government's proof, or of a defense such as insanity"). These issues, which require factual or credibility determinations, are reserved for the courts in the requesting country to resolve after the fugitive is extradited.

D. **Rule of Non-Inquiry**

All matters raised by the fugitive as a defense to extradition, other than those related to the requirements for certification, are to be considered by the Secretary of State, not by the Court. *See* 18 U.S.C. §§ 3184, 3186. For example, the Secretary of State should address a fugitive's contentions that an extradition request is politically motivated, that the requesting state's justice system is unfair, or that extradition should be denied on humanitarian grounds. *Prasoprat*, 421 F.3d at 1016 (extradition judge does not have authority to consider humanitarian objections to extradition); *Koskotas v. Roche*, 931 F.2d 169, 173-74 (1st Cir. 1991) (motives of requesting state is a matter for consideration by the executive branch); *Quinn*, 783 F.2d at 789-90 (noting that "the

Secretary of State has sole discretion to determine whether a request for extradition should be denied because it is a subterfuge made for the purpose of punishing the accused for a political crime, or to refuse extradition on humanitarian grounds because of the procedures or treatment that await a surrendered fugitive") (citation omitted). This practice is consistent with the long-held understanding that the surrender of a fugitive to a foreign government is "purely a national act . . . performed through the Secretary of State." *See In re Kaine*, 55 U.S. 103, 110 (1852).

### III. PROKOP SHOULD BE DETAINED

Just as extradition hearings follow unique procedures, the determination of whether to release a fugitive on bail is also *sui generis*. The federal statutes governing extradition in the United States, 18 U.S.C. §§ 3181 *et seq.*, do not provide for bail. Further, the Bail Reform Act, 18 U.S.C. §§ 3141 *et seq.*, does not apply because, as explained above, an extradition proceeding is not a criminal case. *See Kamrin*, 725 F.2d at 1228; *Martin*, 993 F.2d at 828. Rather, case law provides that bail should be granted in an extradition proceeding "only in the most pressing circumstances, and when the requirements of justice are absolutely peremptory." *United States v. Leitner*, 784 F.2d 159, 160 (2d Cir. 1986) (quoting *In re Mitchell*, 171 F. 289, 289 (S.D.N.Y. 1909) (Hand, J.)).

### A. Applicable Law

#### 1. A strong presumption against bail governs in an international extradition proceeding

Unlike in domestic criminal cases, "[t]here is a presumption against bail in an extradition case." *Salerno v. United States*, 878 F.2d 317, 317 (9th Cir. 1989); *see also Martin*, 993 F.2d at 827; *In re Extradition of Martinelli Berrocal*, 263 F. Supp. 3d 1280, 1294 (S.D. Fla. 2017) ("[A]ny release of a detainee awaiting extradition is largely antithetical to the entire process."). The Supreme Court established this presumption against bail in *Wright v. Henkel*, explaining that when a foreign government makes a

MEMORANDUM OF EXTRADITION LAW
AND REQUEST FOR DETENTION PENDING
EXTRADITION PROCEEDINGS / PROKOP - 12

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

proper request pursuant to a valid extradition treaty, the United States is obligated to deliver the person sought after he or she is apprehended:

> The demanding government, when it has done all that the treaty and the law require it to do, is entitled to the delivery of the accused on the issue of the proper warrant, and the other government is under obligation to make the surrender; an obligation which it might be impossible to fulfill if release on bail were permitted. The enforcement of the bond, if forfeited, would hardly meet the international demand; and the regaining of the custody of the accused obviously would be surrounded with serious embarrassment.

190 U.S. at 62.

The prudential reasons for this presumption against bail in international extradition cases are clear and compelling. When, as here, a requesting country meets the conditions of the Treaty, the United States has an "overriding interest in complying with its treaty obligations" to deliver the fugitive. *In re Extradition of Garcia*, 615 F. Supp. 2d 162, 166 (S.D.N.Y. 2009); *see also Wright*, 190 U.S. at 62. It is important that the United States be regarded in the international community as a country that honors its agreements in order to be in a position to demand that other nations meet their reciprocal obligations to the United States. Such reciprocity would be defeated if a fugitive flees after being released on bond. *See Martinelli Berrocal*, 263 F. Supp. 3d at 1306 ("[O]ur Executive Branch has a vested interest in enforcing our own treaty obligations for fear that other treaty partners will refrain from doing so in the future. And a difficult but necessary measure in carrying out that responsibility is to secure a wanted individual and surrender him or her to the foreign jurisdiction.").

### 2. Fugitives must be detained unless they establish "special circumstances" and also demonstrate that they are neither a flight risk nor a danger to the community

In light of the strong presumption against bail established in *Wright*, fugitives may not be released on bail unless they demonstrate that (1) they are neither a flight risk nor a danger to the community, and (2) "special circumstances" warrant their release. *See, e.g., In re Extradition of Kirby*, 106 F.3d at 862-63; *Leitner*, 784 F.2d at 160-61; *In re*

*Extradition of Antonowitz*, 244 F. Supp. 3d 1066, 1068 (C.D. Cal. 2017); *In re Extradition of Mainero*, 950 F. Supp. 290, 294 (S.D. Cal. 1996). "This 'special circumstances' standard is much stricter than the 'reasonable assurance' of appearance standard made applicable to domestic criminal proceedings by the Bail Reform Act." *In re the Extradition of Kin-Hong*, 913 F. Supp. 50, 53 (D. Mass. 1996).

In evaluating a fugitive's risk of flight in the extradition context, courts have considered, among other things, the fugitive's financial means, ties with foreign countries, and incentive to flee based on the severity of the offense. *See*, *e.g.*, *Martinelli Berrocal*, 263 F. Supp. 3d at 1304; *In re Extradition of Beresford-Redman*, 753 F. Supp. 2d 1078, 1091 (C.D. Cal. 2010) (finding that a "well-educated and sophisticated" fugitive facing serious charges in foreign country had both the "incentive and ability to flee" and therefore presented a flight risk). Crucially, the special circumstances inquiry is separate from considerations of danger to the community or risk of flight. *See*, *e.g.*, *In re Extradition of Perez-Cueva*, 2016 WL 884877, at *2 (C.D. Cal. Mar. 7, 2016) (special circumstances must exist in addition to absence of risk of flight). "Even a low risk of flight" is not a circumstance sufficiently "unique" to constitute a special circumstance. *Leitner*, 784 F.2d at 161; *see also Salerno*, 878 F.2d at 317-18 (lack of flight risk "is not a criteria for release in an extradition case"). Accordingly, a fugitive who poses a danger to the community or a risk of flight should be denied bail, even in the face of special circumstances. *In re Extradition of Siegmund*, 887 F. Supp. 1383, 1384 (D. Nev. 1995).

"Special circumstances must be extraordinary and not factors applicable to all defendants facing extradition." *Mainero*, 950 F. Supp. at 294 (citing *In re Extradition of Smyth*, 976 F.2d 1535, 1535-36 (9th Cir. 1992)). Courts have considered and rejected a lengthy list of would-be special circumstances, including:

- The complexity of the pending litigation, *see*, *e.g.*, *Kin-Hong*, 83 F.3d at 525;

- The fugitive's need to consult with an attorney and/or participate in pending litigation, *see*, *e.g.*, *Smyth*, 976 F.2d at 1535-36;

- The fugitive's character, background, and/or ties to the community, *see*, *e.g.*, *In re Extradition of Noeller*, 2017 WL 6462358, at *5 (N.D. Ill. Dec. 19, 2017); *Beresford-Redman*, 753 F. Supp. 2d at 1089; *In re Extradition of Sidali*, 868 F. Supp. 656, 658 (D.N.J. 1994);

- The fact that the fugitive may have been living openly, *see*, *e.g.*, *Leitner*, 784 F.2d at 160-61; *In re Extradition of Pelletier*, 2009 WL 3837660, at *1, 3-4 (S.D. Fla. Nov. 16, 2009);

- Discomfort, special dietary needs, or medical concerns that can be attended to while incarcerated, *see*, *e.g.*, *In re Extradition of Noeller*, 2017 WL 6462358, at *8-9; *Martinelli Berrocal*, 263 F. Supp. 3d at 1301-02; *In re the Extradition of Kyung Joon Kim*, 2004 WL 5782517, at *5 (C.D. Cal. July 1, 2004);

- U.S. citizenship or the pendency of naturalization or other immigration proceedings, *see*, *e.g.*, *Antonowitz*, 244 F. Supp. 3d at 1072; *Matter of Knotek*, 2016 WL 4726537, at *7; *In re Extradition of Orozco*, 268 F. Supp. 2d 1115, 1117 (D. Ariz. 2003);

- The fugitive's professional status, *see*, *e.g.*, *Pelletier*, 2009 WL 3837660, at *3-4 (allegedly well-respected businessman); *In re Extradition of Heilbronn*, 773 F. Supp. 1576, 1581-82 (W.D. Mich. 1991) (highly-trained doctor);

- The availability of electronic monitoring, *see*, *e.g.*, *In re Extradition of Rovelli*, 977 F. Supp. 566, 569 (D. Conn. 1997);

- Ordinary delay or delay occasioned by the fugitive in the course of extradition proceedings, *see*, *e.g.*, *Salerno*, 878 F.2d at 318; *Antonowicz*, 244 F. Supp. 3d at 1070; and

- The availability of bail for the same offense in the requesting country, *see*, *e.g.*, *Antonowicz*, 244 F. Supp. 3d at 1070; *Kyung Joon Kim*, 2004 WL 5782517, at *2; *Siegmund*, 887 F. Supp. at 1386-87.

While in certain exceptional cases some of the above may have been deemed a special circumstance, courts generally determine special circumstances to exist based on a confluence of factors, as opposed to any single consideration. Such findings are highly

case-specific and within the discretion of the Court, mindful of the strong presumption against bail and future reciprocity of other countries at stake.

B.  Analysis

The Court should detain Prokop without bond because he is both a flight risk and a danger to the community.

*First*, Prokop is a danger to the community because he has already been convicted of participating in four violent robberies in the Czech Republic. In perpetrating these robberies under Prokop's direction, Prokop's co-defendants threatened the victims with firearms, assaulted them, tied them up, and, on occasion, used tranquilizers to subdue the victims. Given the serious nature of these offenses, the community both here in the United States and elsewhere would be at risk if Prokop were released from custody.

*Second*, Prokop should be detained because he is a flight risk. A fugitive charged with a crime in another country is already by definition in flight or deliberately absent from that jurisdiction, and the fact that the fugitive has evaded prosecution in that country is indicative of his risk of flight in the United States. *Cf. United States v. Botero*, 604 F. Supp. 1028, 1035 (S.D. Fla. 1985) ("In the context of determining whether a defendant poses a substantial risk of flight, this Court does not find any meaningful distinction between a person who left the country when he learned of pending charges and one who already outside the country refuses to return to face these charges. The intent is the same-the avoidance of prosecution.") (citing *Jhirad v. Ferrandina*, 536 F.2d 478, 483 (2d Cir. 1976)). Moreover, Prokop has demonstrated that he is capable of avoiding detection by authorities. After orchestrating and participating in the four violent robberies between 1995 and 1996, Prokop fled to the United States in 2004. Since arriving, Prokop is believed to have lived in Nebraska, Michigan, and Colorado before ultimately arriving here in Washington. During this time and in an effort to evade law enforcement, Prokop has utilized several aliases, including Krystof Buliasz, Roland Lacimak, Lukas Malina and Jan Pastorek, and has successfully obtained fake identification cards and driver's licenses in those names from a variety of states. The Czech Republic initially sought Prokop's extradition from

MEMORANDUM OF EXTRADITION LAW
AND REQUEST FOR DETENTION PENDING
EXTRADITION PROCEEDINGS / PROKOP - 16

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

the United States in 2011, the United States obtained an arrest warrant for him in 2012, but the case was closed in 2016 because U.S. law enforcement authorities were unable to locate him. During yesterday's arrest, Prokop admitted his identity to arresting officers, but was in possession of Slovenian identification documents, including a passport, in the name of Filip Koloman, and approximately $15,000. Allowance of bail in any amount would not guarantee Prokop's presence in court and would invite the possibility of embarrassing the United States in the conduct of its foreign affairs.

Prokop's risk of flight and danger to the community are sufficient for the Court to deny any forthcoming application for bail. However, even if the Court were satisfied that he is not a flight risk nor a danger to the community, the government is unaware of any "special circumstances" that would justify bail in this case. Should, however, the Court be inclined to grant bail in this case, the government respectfully requests that the Court submit special written findings as to those specific matters that are found to constitute "special circumstances." Moreover, in order to protect the ability of the United States to meet its treaty obligations to the Czech Republic, the government also requests that the Court notify the parties within a reasonable amount of time in advance of any contemplated release order.

//
//
//

## IV. CONCLUSION

For the foregoing reasons, the United States requests that Prokop be detained pending resolution of this extradition proceeding.

DATED this 29th day of April, 2020.

Respectfully submitted,

BRIAN T. MORAN
United States Attorney

*s/ C. Andrew Colasurdo*
C. ANDREW COLASURDO
Assistant United States Attorney
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, WA 98101
Telephone: 206 553 7970
E mail: Andy.Colasurdo@usdoj.gov

MEMORANDUM OF EXTRADITION LAW
AND REQUEST FOR DETENTION PENDING
EXTRADITION PROCEEDINGS / PROKOP - 18

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

# CERTIFICATE OF SERVICE

I hereby certify that on April 29, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorney(s) of record for the defendant(s).

*s/ Karen Wolgamuth*
KAREN WOLGAMUTH
Paralegal
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
Phone: (206) 553-5050
FAX: (206) 553-4440
E-mail: karen.wolgamuth@usdoj.gov